# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| INTERFORM, INC. | § | |
| | § | |
| v. | § | CASE NO. 2:13-CV-281-JRG-RSP |
| | § | |
| STAPLES, INC. | § | |
| _____ | § | |
| | § | |
| INTERFORM, INC. | § | |
| | § | |
| v. | § | CASE NO. 2:13-CV-284-JRG-RSP |
| | § | |
| YAFA PEN CO. | § | |
| _____ | § | |
| | § | |
| INTERFORM, INC. | § | |
| | § | |
| v. | § | CASE NO. 2:13-CV-296-JRG-RSP |
| | § | |
| TARGET CORP. | § | |
| _____ | § | |
| | § | |
| INTERFORM, INC. | § | |
| | § | |
| v. | § | CASE NO. 2:13-CV-297-JRG-RSP |
| | § | |
| MEGA BRANDS INTERNATIONAL, et al. | § | |

## CLAIM CONSTRUCTION
## MEMORANDUM AND ORDER

On July 1, 2014, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent No. 6,447,190. After considering the arguments made by the parties at the hearing and in the parties' claim construction briefing (Dkt. Nos. 45, 48, and 51),[1] the Court issues this Claim Construction Memorandum and Order.

---

[1] Citations to documents (such as the parties' briefs and exhibits) in this Claim Construction Memorandum and Order refer to the page numbers of the original documents.

**Table of Contents**

**BACKGROUND** ................................................................................................................................ 3
**LEGAL PRINCIPLES** ..................................................................................................................... 3
**THE PARTIES' STIPULATED TERMS**....................................................................................... 6
**CONSTRUCTION OF DISPUTED TERMS**................................................................................. 6
    A. "main body having a gripping portion having a recess"......................................................... 7
    B. "recess" ................................................................................................................................... 9
    C. "[longitudinally extending, tubular shell] having a Shore A hardness sufficient to maintain the shape of the grip"................................................................................................ 9
    D. "inner surface abuting [*sic*, abutting] with the main body" ................................................. 13
**CONCLUSION** .............................................................................................................................. 17
**APPENDIX A** ................................................................................................................................. 18

**BACKGROUND**

Plaintiff brings suit alleging infringement of United States Patent No. 6,447,190 ("the '190 Patent"). The '190 Patent is titled "Viscoelastic Grip for a Writing Implement" and bears an earliest priority date of October 16, 1998. The '190 Patent originally issued on September 10, 2002, and the Abstract of the '190 Patent states:

> A grip adapted for attachment to a writing implement includes a longitudinally extending tubular shell having an inner surface and an outer surface. The grip further includes a viscoelastic hand/finger surface formed about the outer surface of the tubular shell.

An Inter Partes Reexamination Certificate issued on December 20, 2012, cancelling the original claims and adding new Claims 6-10. Dkt. No. 45 at 1. Also of note, the reexamination proceedings included an appeal to the Board of Patent Appeals and Interferences ("BPAI") (now known as the Patent Trial and Appeal Board) of the United States Patent and Trademark Office. An appeal to the Court of Appeals for the Federal Circuit resulted in affirmance without opinion. *Pentel Co., Ltd. v. Kappos*, No. 2012-1002, 470 F. App'x 900 (Fed. Cir. June 13, 2012).

The Court previously construed claims of the patent-in-suit in *Benjamin Kwitek, et al. v. Pilot Corp., et al.,* No. 2:05-CV-533, Dkt. No. 72 (E.D. Tex. Apr. 10, 2007) (Clark, J.) ("*Pilot*"), which is attached to Plaintiff's Opening Claim Construction Brief (Dkt. No. 45) as Exhibit 1.

**LEGAL PRINCIPLES**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See id.* at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns*

*Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312-13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314-15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of

the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic

evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

## THE PARTIES' STIPULATED TERMS

Prior to the July 1, 2014 hearing, the parties reached agreement on constructions for several terms, as stated in their April 30, 2014 Joint Claim Construction and Prehearing Statement Pursuant to Local Patent Rule 4-3 (Dkt. No. 42), their briefing, and their June 17, 2014 Joint Claim Construction Chart Pursuant to Local Patent Rule 4-5(d) (Dkt. No. 52, Ex. A). Those agreed-upon constructions are set forth in Appendix A to this Claim Construction Memorandum and Order.

## CONSTRUCTION OF DISPUTED TERMS

All of the disputed terms appear in Claim 6 of the '190 Patent, which recites (disputed terms italicized):

> 6. A writing implement, comprising:
> *a main body having a gripping portion having a recess*;
> a grip shaped and dimensioned to fit about the gripping portion of the main body and within the *recess* of the gripping portion so as to be releasably secured to the main body and flush with an overall shape of the main body;
> the grip including a *longitudinally extending, tubular shell having a Shore A hardness sufficient to maintain the shape of the grip*, the shell has an *inner surface abuting* [*sic*, abutting] *with the main body* and an outer surface, and a viscoelastic hand/finger surface positioned about the outer surface of the tubular shell, the viscoelastic hand/finger surface having a Shore A Durometer hardness of 2 to 35;
> the shell further including proximal and distal lips retaining the viscoelastic hand/finger surface positioned in a central section of the tubular shell.

Shortly before the start of the July 1, 2014 hearing, the Court provided the parties with preliminary constructions of the disputed terms with the aim of focusing the parties' arguments and facilitating discussion. Those preliminary constructions are set forth within the discussion of each term, below.

### A. "main body having a gripping portion having a recess"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "the principal part of the writing implement having a distinct portion for holding the writing implement while writing" | "the principal part of the writing implement having a distinct portion designed for holding the writing implement while writing. The distinct portion has a recess[.]"[2] |

Dkt. No. 45 at 7; Dkt. No. 48 at 10 (Defendants' proposal is reproduced here without Defendants' notation that "recess" is a separate disputed term that is addressed below).

In *Pilot*, the parties agreed to construe "main body having a gripping portion" in Claim 1 to mean "the principal part of the writing implement having a distinct portion designed for holding it while writing." No. 2:05-CV-533, Dkt. No. 71, 4/10/2007 Order on Agreed Claim Terms at 1.

Shortly before the start of the July 1, 2014 hearing, the Court provided the parties with the following preliminary construction: "the principal part of the writing implement has a distinct portion for holding the writing implement while writing, and the distinct portion has a recess." Plaintiff had no opposition to this preliminary construction. Defendants were opposed.

Plaintiff has argued that because the parties' only real dispute concerns the term "recess," which the parties have briefed as a separate disputed term, no construction is necessary as to the "main body having a gripping portion having a recess." Dkt. No. 45 at 7.

Defendants responded that "[t]he parties do, however, have a dispute as to the construction of 'gripping portion' -- namely that Plaintiff intentionally eliminates the 'designed' part of the construction." Dkt. No. 48 at 10. Defendants argued that the disputed term requires "something that can be held, *i.e.*, physical structure that is grasped when the writing implement is

---

[2] Defendants previously proposed a construction that replaced "recess," which is a separate disputed term, with their proposed construction for that term. *See* Dkt. No. 42, Ex. A at 1.

in use," as opposed to an "open space (*i.e.*, a complete void)." *Id.* Defendants submitted that Plaintiff argued as much during reexamination and that, in *Pilot*, Plaintiff agreed to a construction that included the phrase "designed for holding." *Id.* at 11. Defendants urged that judicial estoppel should preclude Plaintiff from arguing for a different construction here. *Id.* at 11-12.

Plaintiff replied: "The word 'designed' simply underscores that the claimed 'gripping portion' refers to the particular region of the writing implement that was designed to be a locational portion for the user to grasp. It does not, however, require any physical structure, let alone the highly specific physical structure urged by Defendants here." Dkt. No. 51 at 4. Nonetheless, Plaintiff "is willing to accept the inclusion of 'designed' in the construction of this claim term provided the Court clarifies this inclusion does not require, as Defendants maintain, any physical or specific structure independent of the grip itself." *Id.* at 5.

At the July 1, 2014 hearing, Plaintiff had no objection to the part of the Court's preliminary construction stating that "the distinct portion has a recess." Plaintiff also stated that it had no objection to including the word "designed" in the construction so long as Defendants do not argue that the intent of a designer is a limitation of the claim. Defendants agreed that including the word "designed" in the construction would not introduce any limitation concerning subjective design intent.

The Court therefore substantially adopts the *Pilot* construction and hereby construes **"main body having a gripping portion having a recess"** to mean **"the principal part of the writing implement has a distinct portion designed for holding the writing implement while writing, and the distinct portion has a recess."** In so construing the disputed term, the Court is

expressly relying upon the parties' above-noted agreement that this construction does not introduce any limitation as to the subjective intent of a designer.

**B. "recess"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Plain and ordinary meaning"<br><br>Alternatively:<br>    "an indented area of the gripping portion of the main body wherein the grip is releasably secured from the main body of the writing instrument. The recess allows the grip to be flush with the overall shape of the main body." | "a space defined by an indentation in a body between ridges or protuberances that is of reduced diameter relative to that of the main body" |

Dkt. No. 45 at 7 (Plaintiff's proposal is reproduced here without Plaintiff's notation that "releasably secured" was a separate disputed term); Dkt. No. 48 at 13.

Shortly before the start of the July 1, 2014 hearing, the Court provided the parties with the following preliminary construction: "a space defined by an indentation that is of reduced diameter relative to that of the main body." The parties reached agreement at the July 1, 2014 hearing that the Court's preliminary construction should be adopted.

The Court accordingly hereby construes **"recess"** to mean **"a space defined by an indentation that is of reduced diameter relative to that of the main body."**

**C. "[longitudinally extending, tubular shell] having a Shore A hardness sufficient to maintain the shape of the grip"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a structure that is firm enough to maintain the shape of the grip while the writing implement is used for writing" | "a structure that is firm enough to maintain the shape of the grip while the writing implement is used for writing, but that is less firm than the gripping portion of the main body" |

Dkt. No. 45 at 10; Dkt. No. 48 at 17; Dkt. No. 52, Ex. A at 4.

Shortly before the start of the July 1, 2014 hearing, the Court provided the parties with the following preliminary construction: "a structure that is firm enough to maintain the shape of the grip while the writing implement is used for writing." Defendants were opposed to this preliminary construction.

### (1)  The Parties' Positions

Plaintiff argues that "[t]he claim language of the '190 patent provides no comparison of the shell hardness and the main body hardness, and nothing in the specification supports reading such a limitation into the claim terms." Dkt. No. 45 at 11.  To the contrary, Plaintiff argues, the specification discloses an "integrally formed writing implement/grip 200." *Id.* (quoting '190 Patent at 4:59-60).  Plaintiff concludes that Defendants' proposal, which would limit the disputed term to one of the other disclosed embodiments, should be rejected. *Id.*

Defendants respond that during reexamination, Plaintiff stated to the BPAI that the shell has a hardness that is less than that of the main body.  Dkt. No. 48 at 17-19.  Defendants argue that the BPAI relied upon Plaintiff's statement in reversing a rejection of Claim 6. *Id.* at 18-19.

Plaintiff replies that "at a BPAI reexamination hearing, [Plaintiff's] counsel briefly suggested that one embodiment – a bladder grip embodiment – could have a shell with a hardness less than the 'writing implement.'" Dkt. No. 51 at 7.  Plaintiff argues that its counsel's statement was incomplete, as indicated in the transcript, and "never compared the shell with the 'main body' as Defendants' proposed construction would require." *Id.* at 8.  Plaintiff further submits that "[t]he BPAI's opinion . . . does not once mention or even implicitly rely on the statements on which Defendants' prosecution-disclaimer argument is based.  In fact, the BPAI opinion does not even generally discuss shell hardness." *Id.*

(2)  Analysis

Claim 6 recites (emphasis added):

6.  A writing implement, comprising:
    a main body having a gripping portion having a recess;
    a grip shaped and dimensioned to fit about the gripping portion of the main body and within the recess of the gripping portion so as to be releasably secured to the main body and flush with an overall shape of the main body;
    the grip including a longitudinally extending, tubular *shell having a Shore A hardness sufficient to maintain the shape of the grip*, the shell has an inner surface abuting [*sic*, abutting] with the main body and an outer surface, and *a viscoelastic hand/finger surface positioned about the outer surface of the tubular shell, the viscoelastic hand/finger surface having a Shore A Durometer hardness of 2 to 35*;
    the shell further including proximal and distal lips retaining the viscoelastic hand/finger surface positioned in a central section of the tubular shell.

As Plaintiff has noted, the specification discloses an embodiment in which the shell is unitary with the writing implement, which implies that the shell could be composed of the same material as—and presumably have the same hardness as—the main body of the writing implement:

> The grips 10, 110 described above are designed for selective attachment to an existing writing implement in a manner allowing an individual to readily remove and replace the grips, if necessary.  However, and as those skilled in the art will readily appreciate, the underlying concepts of the present grip may be applied in manufacturing an integrally formed writing implement/grip 200.  Specifically, and with reference to FIG. 4, *the shell 212 of the grip 210 is integrally formed as part of the grip portion 214 of the writing implement 216* and the viscoelastic hand/finger surface 224 is coupled directly thereto.

'190 Patent at 4:54-64 (emphasis added).  Although "[i]t is not necessary that each claim read on every embodiment," *Baran v. Medical Device Technologies, Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010), this disclosure is nonetheless probative, particularly in the absence of any suggestion in the claim or the specification that the *shell* (as opposed to the outside of the grip) must be softer than the main body.

As for the reexamination prosecution history, Plaintiff stated as follows during an appeal to the BPAI:

> [The Board]: Counsel, if I may ask, just for my benefit, what is the purpose of the shell -- ?
>
> [Plaintiff's counsel]: The purpose --
>
> [The Board]: -- in the '109 [*sic*, '190] patent?
>
> [Plaintiff's counsel]: The purpose of the shell is you have a writing element that has a certain hardness, then *you have a shell that has a hardness less than the writing implement* but --
>
> [The Board]: It's an *intermediary durometer*[3] *of hardness* so that --
>
> [Plaintiff's counsel]: *Yes*, your Honor. So it's rigid -- it's hard enough to hold the bladder -- I mean the bladder or the cushioning material in place but -- so you never have to feel the hard pen. It's just the idea of comfort.
>
> [The Board]: *So the mere recess in the outer body of the pen is insufficient because it's rigid.*
>
> [Plaintiff's counsel]: *Yes*, just -- just having the -- the shell in there, you know, makes it more comfortable and that's the idea. You know, it's a very -- it's a very competitive area and, you know, comfort is king and that's why -- that's why I made such a big deal about the putting the extra protrusion on the Japanese -- the Japanese reference and if you decrease comfort, you have defeated your purpose.

Dkt. No. 45, Ex. 3, 12/15/2010 BPAI Hearing Transcript at 16:5-23 (emphasis added); *see id.* at 10:5-16:4 (discussing the "Japanese reference" referred to in the above-quoted passage).

On balance, these statements at the reexamination hearing related to background and to purposes of the claimed invention and do not amount to definitive statements as to the scope of the present disputed term. *See Omega Eng'g v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive*

---

[3] "Durometers," in this context, are hardness measurements. *See* '190 Patent at 3:11-13 & 6:18-19.

statements made during prosecution.") (emphasis added); *see also Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1373 (Fed. Cir. 2005) ("A disclaimer must be clear and unambiguous.") (citing *Omega*).

Finally, although Defendants have argued that the BPAI relied upon the above-quoted statements (*see* Dkt. No. 48 at 17-18), the Decision on Appeal does not reflect any reliance on the hardness of the shell as compared to the hardness of the main body. Instead, the portion of the Decision on Appeal that Defendants have cited addresses "whether there would have been a reason at the time of the invention to have put proximal and distal lips on a shell which is to be inserted into the main body recess of a writing implement." Dkt. No. 45, Ex. 2 at 17-18; *see id.* at 17-19.

Defendants' proposed construction is therefore rejected, and the Court accordingly hereby construes **"[longitudinally extending, tubular shell] having a Shore A hardness sufficient to maintain the shape of the grip"** to mean **"a structure that is firm enough to maintain the shape of the grip while the writing implement is used for writing."**

D. **"inner surface abuting [*sic*, abutting] with the main body"**

| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| "Plain and ordinary meaning" Alternatively: "inner surface touching or adjacent to the main body"[4] | "inner surface touching the main body" |

Dkt. No. 45 at 15; Dkt. No. 48 at 20.

---

[4] Plaintiff previously proposed: "Plain and ordinary meaning of abutting. Alternatively, an appropriate synonym in context of surrounding claim language and specification would be 'next to' or 'adjacent.'" Dkt. No. 42, Ex. A at 7.

Shortly before the start of the July 1, 2014 hearing, the Court provided the parties with the following preliminary construction: "inner surface touching or adjacent to the main body." Defendants were opposed to this preliminary construction.

(1)  The Parties' Positions

Plaintiff argues that "the plain and ordinary meaning of the disputed term permits the inside surface of the shell to touch the main body or to border the main body even if they do not explicitly touch" because "[t]he plain meaning of 'abutting' . . . is well known to include either touching *or* being adjacent to or near." Dkt. No. 45 at 16. Plaintiff urges that nothing in the specification is to the contrary. *Id.*

Defendants respond that "[i]n order for it to fit about and be engaged by the gripping portion of the main body, the inner surface of the shell must necessarily touch the main body and not merely be adjacent to it." Dkt. No. 48 at 21. Defendants have also cited extrinsic dictionary definitions for "abutting" that refer to touching. *Id.* (citing Ex. M, *Merriam-Webster's Online Dictionary*) ("1 : to *touch* along a border or with a projecting part <land abuts on the road> / 2 a : to terminate at a point of *contact* / b : to lean for support.") (emphasis modified).

Plaintiff replies that "'abut' and 'fitting about' are different claim terms that must be construed to mean different things." Dkt. No. 51 at 10.

(2)  Analysis

Claim 6 recites (emphasis added):

6. A writing implement, comprising:
    a main body having a gripping portion having a recess;
    a grip shaped and dimensioned to *fit about* the gripping portion of the main body and within the recess of the gripping portion so as to be releasably secured to the main body and flush with an overall shape of the main body;
    the grip including a longitudinally extending, tubular shell having a Shore A hardness sufficient to maintain the shape of the grip, the shell has an *inner surface abuting* [*sic*, abutting] *with the main body* and an outer surface, and

- 14 -

> a viscoelastic hand/finger surface positioned about the outer surface of the tubular shell, the viscoelastic hand/finger surface having a Shore A Durometer hardness of 2 to 35;
>
> > the shell further including proximal and distal lips retaining the viscoelastic hand/finger surface positioned in a central section of the tubular shell.

Defendants seemingly propose reading the disputed term in conjunction with the first limitation that recites the grip, such that the shell must "fit about the gripping portion of the main body and within the recess of the gripping portion so as to be releasably secured to the main body and flush with an overall shape of the main body." *See* Dkt. No. 48 at 21 (quoted above). Yet, that limitation applies to the grip, not the shell, so nothing in that limitation precludes the grip from satisfying the claim in some manner *other than* by having a shell touching the main body.

Further, as Plaintiff has argued, the recital of "to fit about" in the above-quoted limitation suggests that the phrase "abut[t]ing with" in the disputed term has a meaning different from "to fit about." *See Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004) ("[T]he use of both terms in close proximity in the same claim gives rise to an inference that a different meaning should be assigned to each."); *see also CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."); *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

The specification provides additional context by using "fit about" and "abut" in relation to one another:

> In accordance with a preferred embodiment of the present grip, and with reference to FIGS. 1 and 2, the grip 10 is shaped and dimensioned to fit about the gripping

portion 14 of the main body 20 of a writing implement 16 so as to be releasably secured to the main body 20. The grip 10 includes a shell 12. Because of the shape and fit of the grip 10, the shell 12 includes an inner surface 18 shaped and dimensioned to *fit about and abut the main body 20* of the writing implement 16 at a position in line with the grip portion 14 thereof.

'190 Patent at 3:15-23 (emphasis added); *see id.* at 1:45-50 ("The grip also includes a viscoelastic hand/finger surface formed *about* the outer surface of the tubular shell.") (emphasis added); *see also id.* at 4:25-27 ("[T]he grip 110 includes a shell 112 shaped and dimensioned to *fit about* the grip portion 14 of a writing implement 16.") (emphasis added).[5]

The best reading of the claim language and the above-quoted portions of the specification is that whereas "fit about" refers to a grip surrounding the main body, the term "abut[t]ing" is used to identify a particular surface of the shell of the grip. Specifically, "abut[t]ing" is used in Claim 6 to identify the shell surface that faces the main body, as opposed to the shell surface that faces the viscoelastic hand/finger surface.

Finally, this reading is consistent with the extrinsic dictionary definitions, cited by the parties, that include "to be adjacent" as part of the definitions for "abut." *See, e.g.,* Dkt. No. 45, Ex. 4, *Random House Webster's College Dictionary* 6 (2001) ("1. to be *adjacent*; touch or join at the edge or border (often fol. by on, upon, or against). . . . 2. to be *adjacent* to; border on; end at. 3. to support by an abutment.") (emphasis modified).

In sum, limiting the meaning of "abutting" to "touching" in the '190 Patent would introduce a limitation without adequate support in the intrinsic evidence. *See Phillips*, 415 F.3d

---

[5] Also of note, the parties in the above-captioned case have agreed to construe "positioned about the outer surface of the tubular shell" to mean "on or surrounding the shell," which is the same interpretation that the BPAI applied. Dkt. No. 52, Ex. A at 2; Dkt. No. 45, Ex. 2, Decision on Appeal at 9 (applying the "broadest reasonable interpretation," "we construe 'about' to mean 'on' or 'around'" and "we interpret the limitation that the viscoelastic hand/finger surface be 'positioned about the outer surface of the tubular shell' to mean that surface is on or surrounding the shell, but we do not require it to be contacting or touching the shell along the viscoelastic's entire surface").

at 1321 (noting that "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification").

The Court therefore hereby construes **"inner surface abuting [*sic*, abutting] with the main body"** to mean **"inner surface touching or adjacent to the main body."**

## CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 11th day of July, 2014.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

# APPENDIX A

| Term | Parties' Agreement |
| --- | --- |
| "proximal and distal lips"<br><br>(Claim 6) | "portions of the shell which extend about the circumference at or near each end of the shell" |
| "Shore A Hardness"<br><br>(Claim 6) | "The Shore hardness specifies methods for determining the hardness of materials by means of a type A durometer (Shore A), which measures the hardness of a softer material such as rubbers and thermoplastics" |
| "viscoelastic solid-phase polymer material"<br><br>(Claim 8) | "a material having viscous and elastic properties that is made of a compound or mixture of compounds of uniformly close or coherent nature" |
| "viscoelastic hand/finger surface"<br><br>(Claim 6) | "the external layer of the grip is soft enough to change shape under the pressure exerted by fingers gripping a writing implement to write and which will tend to return to its original shape when released" |
| "positioned about the outer surface of the tubular shell"<br><br>(Claim 6) | "on or surrounding the shell" |
| "a grip shaped and dimensioned to fit about the gripping portion of the main body and within the recess of the gripping portion"<br><br>(Claim 6) | Plain and ordinary meaning |
| "releasably secured"<br><br>(Claim 6) | Plain and ordinary meaning |

Dkt. No. 42 at 1; Dkt. No. 45 at 10 & 17; Dkt. No. 48 at 17 & 21; Dkt. No. 52, Ex. A at 2-3.